552 A.2d 918

**Charles ELLERIN, et al.**

v.

**FAIRFAX SAVINGS ASSOCIATION**

**R. Bruce ALDERMAN, et al.**

v.

**FAIRFAX SAVINGS ASSOCIATION.**

**No. 595, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 1, 1989.

Certiorari Denied May 26, 1989.

94

David Freishtat (Freishtat & Sandler, Baltimore, on the brief for appellants, Charles Ellerin, et al.)

Alvin I. Frederick, Lloyd J. Snow and Eccleston and Seidler, Baltimore, on the brief for appellants, R. Bruce Alderman and White, Mindel, Clarke and Hill.

Steven M. Caplan and Mary T. Keating (Sherry H. Flax, Judith D. O'Neill and Weinberg and Green on the brief), Baltimore, for appellee.

Argued before MOYLAN, ROSALYN B. BELL and KARWACKI, JJ.

ROSALYN B. BELL, Judge.

Two appeals are combined in this opinion. Both appeals arise from Fairfax Savings Association's loan of over $5,000,000 to Sherwood Square Associates to develop a shopping center complex in historic Westminster. Fairfax Savings Association sued Charles and Naoma Ellerin, Louis and Gloria Seidel, and Tri–Ess, Inc. for $2,300,000 in payment guaranties included in the loan (Guaranty Cases), as well as Charles Ellerin and Louis Seidel, the general partners of Sherwood Square Associates, (Partnership Cases) for the amount left due on the loan when they stopped making payments.

In the first appeal, R. Bruce Alderman, the attorney who represented Sherwood Square Associates at the loan closing, presents one issue:

—Does an attorney have a right to intervene in an action in order to protect his interest in a subsequent legal malpractice action which may be filed against him?

Based on these particular circumstances, we hold that the trial court did not err in denying Alderman's intervention motion.

In the second appeal, Charles and Naoma Ellerin, Louis and Gloria Seidel, and Tri–Ess, Inc., contest the jury's verdict of over $2 million in favor of Fairfax Savings Association. They present the following questions:

—Did the trial court err in instructing the jury that ratification of specific fraudulent provisions in a contract by the defrauded party barred that party from recovering any damages resulting from the fraud?

—Should the trial court have admitted evidence that Fairfax Savings Association waived its right to require an architect's certificate to show completion?

—Did the trial court err in determining as a matter of law that there was 120,000 square feet of leasable space

where damages were to be based on a "rent roll" formula in which leasable square footage was a component?

—Did the trial court err in granting Fairfax Savings Association's summary judgment motion in the Partnership Cases?

We reverse and remand for a new trial. For clarity, we analyze the two appeals in separate sections. But first, we set forth the somewhat complex factual and procedural background common to both.

Charles Ellerin and Louis Seidel (Partners) were the general partners in Sherwood Square Associates (SSA), a limited partnership.[1] Fairfax Savings Association (Fairfax) loaned SSA $5.7 million so that SSA could acquire and renovate a group of very old buildings in a historic section of the City of Westminster (City). These buildings, known as the Barrel House Buildings, were essentially empty shells when the project began.

The loan transaction was structured in the following manner. The City issued two Industrial Revenue Bonds (IRBs), the first in the amount of $3,050,000 and the second for $1,800,000, both of which were acquired by Fairfax. Fairfax also made a conventional loan of $850,000 to SSA. SSA repaid the conventional loan before this litigation ensued. The City assigned all its rights in regard to the IRBs to Fairfax,[2] but did, however, maintain an interest in the successful rehabilitation of the buildings, as shown by the Development Agreement entered into by the City and SSA.[3]

---

1.  Sherwood Square Associates had filed for Chapter 11 bankruptcy by March of 1986. We do not know its present status.

2.  Although as issuer of the IRBs the City was the nominal lender and Fairfax the assignee lender, in reality the City neither loaned any of its own funds to SSA nor had any responsibility for repayment.

3.  The Development Agreement contained, *inter alia,* SSA's promise to "diligently and continuously proceed with construction of the Project, and shall cause such construction to be substantially completed by

By the terms of this agreement, SSA agreed that the renovated property would contain "approximately 120,000 square feet of space, for use as retail and commercial facilities...." SSA subsequently assigned an interest in the Development Agreement to Fairfax.

Central to this controversy are the personal guaranties signed by the Partners at the loan settlement—two identical 16–page documents, one for each IRB. These personal guaranties were signed by Charles Ellerin, his wife Naoma Ellerin, Louis Seidel, and his wife Gloria Seidel; Louis Seidel's signature appears again for Tri–Ess Corporation (Guarantors). (Tri–Ess was the general contractor on the project and was owned by Charles Ellerin and Louis Seidel.) All signatures were witnessed by attorney R. Bruce Alderman of the law firm of White, Mindel, Clarke and Hill, who represented the Guarantors, the Partners, and SSA at settlement. Mortgages on the property and buildings provided additional security for the loan.

The twin documents entitled "Completion Guaranties" provided that the Guarantors would complete the project and personally guarantee repayment on the IRB loans. The maximum the Guarantors could be required to repay was $2.3 million—$1.15 million on each IRB. The guaranty provided that this liability would be reduced proportionately as the property was leased, *i.e.*, a "rent roll" formula. The Guarantors' liability was to terminate when the project was completed and 70 percent of its total square footage was leased.[4]

---

May 1, 1984, time being of the essence." The City agreed to issue the bonds, and to construct parking facilities, utilities, and landscaping.

4. The rent roll formula is somewhat complex, and appears in Art. III, § 3.1(c)(ii) of each "Completion Guaranty." It looks like this:

$$\$1,150,000 \times \frac{70\% \text{ less percentage of total leasable space leased}}{70\%}$$

For example, if the Guarantors had leased seven percent of the total leasable space, their liability would be reduced to $1,035,000.

Given that the project met with reverses, one needs no lengthy experience to predict what happened next. SSA defaulted on the loan and Fairfax filed complaints against Charles Ellerin and against Louis Seidel as the general partners of SSA on November 26, 1985. Fairfax also filed complaints against the Guarantors, based on the previously described personal payment guaranties. Judgments by confession were docketed the next day. The Guarantors filed motions to vacate the confessed judgments, claiming, *inter alia*, that Fairfax had fraudulently hidden the two 16–page guarantees amidst the many and varied settlement documents at the closing. The Guarantors also claimed that the documents, which had been pre-approved, had been changed between the approval and settlement. They also claimed that they had signed the documents under duress, without an opportunity to read them, because Fairfax had told them that the deal could not be consummated unless the documents were signed. On December 30, 1985, the Guarantors filed an affirmative suit against Fairfax, including counts of fraud, duress, and negligent misrepresentation, and claiming $6 million in compensatory and $10 million in punitive damages against Fairfax. An extremely lengthy motions battle ensued—it is sufficient for our purposes here to note that ultimately the Guarantors' affirmative suit took on the guise of a counterclaim. The Guaranty cases were consolidated, the Partnership cases were consolidated, and the trial judge ordered that they be tried in sequence.

R. Bruce Alderman and the law firm in which he was then a partner, White, Mindel, Clarke and Hill (who, the reader may remember, represented the Guarantors, the Partners, and SSA at the closing),[5] filed a motion to intervene in the litigation on July 30, 1987. Alderman asserted that, because *both* the Guarantors and Fairfax had threatened to sue him (and his law firm) if they lost the case, he had a right to intervene under Rule 2–214(a) to protect his inter-

---

5. The Guarantors retained other counsel to represent them at trial.

ests. The trial judge, after a hearing on August 18, 1987, denied Alderman's motion.

A jury trial began on September 2, 1987. Fairfax offered the executed loans as evidence, as well as testimony from Richard Jacobs, the Fairfax loan officer who worked with the Partners and attorneys, preparing documents for the loan closing. The gist of Jacob's testimony, based on his close work with the principals, was that it had *always* been understood that the Guarantors would be required to guarantee payment on the IRBs because, in the project's initial stages the main buildings were just empty shells and insufficient to secure such a large loan. Jacobs stated that the executed guaranties accurately reflected the terms as ultimately agreed upon during a telephone conference call about a week before the loan closing.

Ellerin and Seidel testified that Ellerin and Alderman conducted all the loan negotiations with Fairfax. Apart from the guarantee that the facility would be completed, the only part of the loan they agreed to guarantee personally was the $850,000 conventional loan. Ellerin testified that it was his understanding that the loans were to be settled in strict accordance with the terms of the three Commitment Letters Fairfax had sent to Ellerin and Seidel on December 21, 1982.[6]

Ellerin testified that he did not read the Commitment Letters, which had been sent to his wife in Florida, but his wife read one of the IRB Commitments to him over the

---

6. Although admitted as exhibits for the Guarantors, the IRB Commitments do not entirely support the Guarantors' position that there were to be no personal payment guarantees on the IRB loans. While the IRB Commitments did not specifically provide for a personal guaranty, they did provide that the Guarantors completion obligations would be "full and unconditional," and that, rather than fully detailing the guaranty obligations in the IRB Commitments, the Guarantors' obligations would be "embodied in a Completion Guaranty to be executed ... on the Closing Date...." Finally, the Commitment Letters provided that "[i]n the event of a conflict, either express or implied, between the Commitment Letter and General Conditions and the Loan documentation, the terms and provisions of the Loan documentation shall govern."

telephone. Ellerin then told Seidel of their contents. Based on their belief that the Commitment Letters controlled all the terms of the loan, and their reliance on Alderman's statement that he had reviewed the loan documents, neither partner read any of the documents signed at the closing. Ellerin testified that he discovered the personal guaranties in October of 1984, after a conversation in which Fairfax's president, Malcolm Berman, referred to them.[7]

Ellerin testified that he experienced severe stress and stomach pain after learning of the personal guaranties, although visits to physicians revealed nothing physically wrong. Ellerin did *not*, however, inform anyone from Fairfax that the personal guaranties were a surprise to him, because "... I thought it would be wise not to say anything, at least get the project finished and paid for.... I made a decision to try to make the project succeed, and to go forward and get it leased up and get enough income where Fairfax got paid; and there wouldn't be a legal battle to avoid."

At the close of all the evidence, the trial judge granted Fairfax's motion for judgment on the Guarantors' duress defense, as well as the Guarantors' negligent misrepresentation counterclaim.[8] The trial judge gave the jury a ratification instruction, accompanied by a special verdict sheet, the effect of which was to preclude the jury from awarding

---

**7.** There was other evidence, however, showing that Ellerin had actual possession of this material a few months after closing. SSA's accountant testified that Ellerin gave him a full set of loan documents in early March of 1983. Ellerin took the documents back for two weeks in March in order to negotiate an employment agreement with Richard Singer Associates, which provided that employment would terminate when "seventy percent (70%) of the leasable area is occupied by tenants acceptable to Owner and Fairfax Savings Associates [sic] pursuant to an agreement between them with respect to leasing...." Richard Singer testified that the 70 percent lease-up term had been suggested to him by either Ellerin or Seidel. Fairfax neither prepared nor was a party to the employment agreement.

**8.** The trial court held that Naoma Ellerin, Gloria Seidel, and Tri–Ess Corporation had produced insufficient evidence to warrant any award of damages to them.

Ellerin damages for fraud if it found that he ratified the contract by his silence.

The month-long trial ended on October 2, 1987, a Friday afternoon. The jury found that Fairfax had fraudulently inserted a payment guarantee into the two identical "Completion Guaranty" documents, but also found that the Guarantors had ratified the fraud, accepted the benefits of the loan, and waived any right they may have had to avoid enforcement. The jury awarded Fairfax damages against the Guarantors for $2,303,984.61.

On October 6, 1987, the trial court granted Fairfax's summary judgment motion in the Partnership Cases, entering judgment against Ellerin and Seidel for $5,263,688.75.

## APPEAL #1

### —Intervention—

■ Alderman contends that the trial court should have allowed him to intervene under Rule 2–214(a), *both* as a third-party defendant in Fairfax's action against Ellerin, and as a third-party plaintiff against Fairfax's law firm, Weinberg and Green. Because Alderman represented SSA and the Guarantors at the closing, Ellerin claimed that he relied on Alderman when he signed the loan documents that included the personal guaranties. Moreover, at the loan closing, Alderman furnished a written opinion to Fairfax to the effect that, after thoroughly reviewing the loan documents, he found the loan agreement to be enforceable "as executed according to its terms." Alderman's opinion specifically mentioned the Completion Guaranties.

The gravamen of Alderman's intervention motion was the inevitability of a subsequent lawsuit against him; the Guarantors threatened to sue him for legal malpractice, and Fairfax threatened a breach of warranty suit based on Alderman's opinion letter. The *chief* problem (but not the only problem as our later comments indicate) with Alderman's intervention motion was the fact that it was not timely filed. We affirm the trial court's denial of Alder-

man's motion because of this untimeliness. We begin our explanation by reviewing the relevant dates.

Alderman's opinion letter was dated December 30, 1982, the date of the loan closing. He received a set of the signed loan documents by March of 1983. According to his trial testimony, Alderman discovered the precise contents of the completion guaranties in early 1984. On November 26, 1985, Fairfax filed the loan actions, seeking to enforce obligations against SSA, Ellerin, Seidel and the Guarantors. The confessed judgments were granted the next day. On December 30, 1985, the Guarantors (represented by other counsel) moved to vacate the confessed judgments, claiming, *inter alia,* fraud in the execution of the loan documents on which they were based. Alderman provided an affidavit for the Guarantors' counsel to support the motion to vacate; the affidavit was filed on April 1, 1986. In the affidavit, Alderman stated he "was not there [at the loan closing] to read and review every document to determine whether they accurately reflected the parties' prior agreement" and that, as counsel for SSA and the Guarantors, his only "purpose of being at that closing was to resolve any questions which arose at closing and to otherwise facilitate the closing...." He stated he had not been privy to and was unfamiliar with the terms of the loan which, Alderman stated, were "negotiated directly ... without counsel." [9] This is as good a time as any to point out that, by Alderman's own sworn affidavit, even if he *had* read the loan documents, he would not have known whether they accurately reflected the parties' agreement in regard to loan security because he was totally unaware of what the parties intended. Nevertheless, stated Alderman, at the closing he signed the opinion letter "solely so that settlement could go to completion ... relying on their [Fairfax's counsel] good faith as members of the bar that the documents prepared

---

**9.** One wonders at the limited usefulness of a closing attorney who purportedly was not retained and does not feel compelled to review loan documents for his clients, and does not familiarize himself with the terms of the deal.

would accurately reflect the parties' agreement...." In any event, Alderman's affidavit illustrated that he knew of the Completion Guaranty controversy during late 1985 and early 1986, if not earlier.[10] Trial was originally scheduled for October of 1986, but twice was postponed and was ultimately set for September 2, 1987. Yet Alderman did not file his motion to intervene until July 30, 1987.

Rule 2–214, "Intervention," provides in pertinent part:

"**(a) Of Right.**—*Upon timely motion,* a person shall be permitted to intervene in an action: (1) when the person has an unconditional right to intervene as a matter of law; or (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties." (Emphasis added.)

As the Court of Appeals pointed out in *Maryland Radiological Society, Inc. v. Health Services Cost Review Commission,* 285 Md. 383, 388, 402 A.2d 907 (1979),[11] the very first words of the Rule indicate that "timely application is a prerequisite to such a request being granted." Indeed, timeliness is such an important requirement that a trial court "should require that the applicant demonstrate the promptness of his request" before it considers the substance of the motion. *Maryland Radiological,* 285 Md. at 388, 402 A.2d 907. Timeliness is so important (and thus, a threshold requirement) because new parties, new facts, and new legal theories may be introduced in the action. As we recently observed, the question of timeliness depends on the individual circumstances of each case; it is a determination

---

**10.** It is not clear exactly when, if ever, Alderman ceased representing SSA in general business matters. As of September 22, 1987, Alderman was not only a limited partner in SSA, but was a shareholder in Chasell, Inc., an educational materials distributing company run by Ellerin.

**11.** At the time *Maryland Radiological* was decided, the Rule governing intervention was Rule 208; Rule 2–214 succeeded Rule 208.

which rests within the sound discretion of the trial court. *Hartford Ins. Co. v. Birdsong,* 69 Md.App. 615, 623, 519 A.2d 219 (1987). It is not essential that the record reflect the extent, if any, on which the trial court based its denial on timeliness. *Hartford Ins. Co.,* 69 Md.App. at 624, 519 A.2d 219.

In *Maryland Radiological,* 285 Md. at 388–89, 402 A.2d 907, the Court of Appeals, guided in part by federal precedent,[12] fashioned a four-prong approach to determine timeliness. First, why does the applicant wish to intervene? Second, how likely is it that the parties already in the case will be prejudiced because of the intervention? Third, to what extent have the proceedings progressed when the applicant seeks to intervene? Fourth, what is the reason for the delay? We analyze each of these criteria in order.

Why did Alderman wish to intervene? His stated purpose was that he had an economic interest to protect, in that one of the parties would inevitably seek to hold him liable. Although as a practical matter it is easy to envision either party suing Alderman, at present such suit is merely theoretical. The precise nature of Alderman's interest was contingent in that it depended on which party prevailed at trial. Moreover, Alderman does not provide us with any details of the alleged threats, thus adding to the speculative nature of his interest.

We shall refrain from reaching the question Alderman would like us to reach; that is, is an attorney's interest in protecting his pocketbook and reputation against a later legal malpractice action a substantial enough interest to allow intervention as of right? The resolution of this issue should await another day and case [13]—preferably one where

---

12. As stated in *Maryland Radiological,* 285 Md. at 388 n. 5, 402 A.2d 907, the federal rule is of considerable precedential value. The Maryland Rule is based on Fed.R.Civ.P. 24(a).

13. The Court of Appeals granted certiorari in a similar issue in *Samborsky v. Jones,* No. 92, September Term, 1987, 310 Md. 276, 528

the attorney's interest is more definite. It is sufficient for our purposes to note that Alderman's interest does not weigh heavily in the balance.

We turn to the second factor, *i.e.*, the probability of prejudice to the parties already in the case. Both parties would have been severely prejudiced by the eleventh hour entry of Alderman. Alderman conceded that a continuance would have been inevitable. In *Hartford Insurance*, 69 Md.App. at 624, 519 A.2d 219, we upheld the trial court's denial of a motion filed three weeks before trial, *despite* the would-be intervenor's assurances that intervention would not delay the proceedings. In the instant case, the motion was filed only a month before trial. It is significant that *both* existing parties resisted intervention, not only because of the delay in this already two-year-old action, but because Alderman's presence and legal posture would have diverted the jury's attention from the central issues of the case. As it was, the issues were sufficiently complex as to require five weeks of trial.

Adding to the virtual certainty of prejudice was the fact that Fairfax's counsel would have been forced to withdraw because of Alderman's third-party complaint. If its counsel had been disqualified a month before trial, the expense, burden and delay to Fairfax would have been enormous. In a complex case, disqualification of counsel causes hardship to the client because it may take replacement counsel months to master the details of the action. *See Council for the Nat'l Register of Health Serv. Providers in Psychology v. American Home Assurance Co.*, 632 F.Supp. 144, 147 (D.D.C.1985).

A look at the third factor, the point to which the proceedings had progressed when the motion was filed, shows that it was filed after discovery had been completed and when all but the final trial preparation remained.

A.2d 1287. On August 24, 1988, however, the appeal was officially dismissed pursuant to the parties' request.

Which brings us to the fourth and final factor: was there any compelling reason for this delay? The short answer to this question is "no." Alderman suggests that the delay was justified because he did not retain counsel until June, 1987. This is not a particularly compelling reason because, as his 1986 affidavit illustrates, he knew what issues would be addressed in Fairfax's loan action. Indeed, it was obvious that he was central to the Guarantors' counterclaim. Additionally, Alderman knew that he had provided an opinion letter at the closing—as an attorney with over 15 years experience in real estate practice, he must have seen the handwriting on the wall. Even if one uses the reopening of the confessed judgments (December, 1986) as the date from which to judge timeliness, there remains a seven-month delay. We hold that the trial court correctly denied the motion to intervene.

## APPEAL # 2

### —The Ratification Instruction—

The Guarantors (appellants) contend that the trial court improperly instructed the jury; they argue that the trial court confused rescission with ratification. At trial, Ellerin testified that, upon discovering the allegedly fraudulent Completion Guaranties, he did not tell Fairfax of his discovery. Instead, Ellerin opted to mitigate his damages by trying to lease-up as much of the property as was possible. *See* n. 4, *supra.*

Over objection, the jury was instructed that, if Ellerin's actions constituted ratification, that Ellerin

"[is] barred from claiming a right to have the contract agreements declared null and void *or* to seek damages from any fraud by Fairfax and your verdict will be in favor of Fairfax ... [which] they should then enter [for] $2,303,984.61." (Emphasis added.)

The trial court also presented the jury with a special verdict sheet, which provided in pertinent part:

"If you have answered questions [referring to fraud] 1–6 'yes', then you are instructed that you have concluded

that Fairfax was guilty of fraudulent or deceitful conduct in having caused the insertion of the 2.3 million dollar payment guarantees in the Completion Guarantees.

"7. If you have answered questions 1–6 'yes', do you find from a preponderance of the evidence that the Defendants, after learning of the fraud, ratified the contract agreements by conduct which clearly showed that Defendants elected to proceed with the loan agreements and to give up their right to cancel the contract agreements or have then declared null and void?

Yes <u> X </u>    No <u>   </u>

"*If your answer to question 7 is 'yes' then you have concluded that Defendants are barred* from claiming a right to have the contract agreements declared null and void or *to seek damages from any fraud by Fairfax* and your verdict will be in favor of Fairfax against Defendants in the sum of $2,303,984.61. . . .

"8. *If you answered 1 through 6 'yes' and question 7 'no', then you may consider whether Charles Ellerin and/or* Louis Seidel have proven by a preponderance of the evidence that they are entitled to damages for emotional distress." (Emphasis added.)

As was apparent from both the trial court's oral instructions and the special verdict sheet, the jury was precluded from going on to find damages caused by Fairfax's fraud if they concluded that appellants had ratified the contract. Shortly after the jury began its deliberations, the trial court received a jury communication showing some confusion in regard to the instruction. The jury reached a verdict late on the fifth Friday afternoon of trial, October 2, finding fraud and entering judgment as instructed. We reverse and remand for a new trial because the trial court should have permitted the jury to consider an award of damages to appellants. We remand for a new trial on *all* issues because of the likelihood that the jury's verdict was compromised by its evident confusion about the erroneous instructions. We begin our explanation by reviewing and defining some basic contract terms.

A contract is voidable if a party has the power to elect to avoid the legal duties created by the contract, or by ratification to extinguish this power to avoid. The power to avoid or ratify is given to persons who have been induced to enter into a contract by fraud or misrepresentation. Calamari and Perillo, *The Law of Contracts* § 1–11 (1977).

One can avoid the legal duties of an allegedly fraudulent contract by rescission. Rescission amounts to an "unmaking" of a contract. Rescission is a form of retroactive relief where all rights and responsibilities of parties toward each other are abrogated from the inception of the contract. *Metropolitan Property and Liability Ins. Co. v. Commonwealth*, 97 Pa.Cmwlth. 219, 509 A.2d 1346, 1348 (1986). "Rescission" calls for the cancellation of the bargain and a return of the parties to the status quo. *Myzel v. Fields*, 386 F.2d 718, 742 (8th Cir.1967). It is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud, or duress. *Dreiling v. Home State Life Ins. Co.*, 213 Kans. 137, 515 P.2d 757, 766 (1973). It is interesting to note that § 2–720 of the Uniform Commercial Code recognizes that "rescission" is often used by lawyers, courts and businessmen in many different senses. For example, rescission may be loosely used to designate termination of a contract pursuant to an option to terminate contained in the agreement. It might be used to designate cancellation for breach, or it might be used, as it was in the instant case, to designate avoidance because of fraud.[14] *See* Calamari and Perillo, *Law of Contracts* § 21–2. The usual way in which rescission is accomplished is by the parties' mutual consent, *Glen Alden Corp. v. Duvall*, 240

---

**14.** *See, e.g.,* Annotation, *Notice of Rescission as Irrevocable Election When Other Party Refuses to Assent Thereto,* 1 A.L.R.2d 1084 (1948), in which the author compiles cases involving significantly different issues merely because the court used the term "rescission." For clarity, the Uniform Commercial Code carefully distinguishes between these situations, and uses "rescission" as a term of art to refer to a mutual agreement to discharge contractual duties. U.C.C. § 2–209, Comment 3.

Md. 405, 431, 215 A.2d 155 (1965), although a party may seek unilateral rescission as an equitable remedy.

Rescission is considered to be a radical remedy; it therefore must be promptly asserted once a party discovers facts which justify it. *Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 68 (1970). The party seeking rescission must show the intent to restore the parties to their original positions, *i.e.,* return any benefits received under the contract. *Lazorcak v. Feuerstein,* 273 Md. 69, 75–77, 327 A.2d 477 (1974). The right to rescind, therefore, may be waived by treating the contract as a continuing obligation. If a party acts in a way which recognizes the subsisting validity of the contract or indicates that he or she still feels bound under it, he or she will be held to have waived the right to rescind. *Bagel Enterprises, Inc. v. Baskin & Sears,* 56 Md.App. 184, 200–01, 467 A.2d 533 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984).

In the instant case, appellants obviously were not entitled to have the contract rescinded because they failed to act promptly after discovering the fraud. We see nothing in the record which indicates that appellants wanted to return the loan monies and have the contract rescinded. Rescission, however, was not appellants' only remedy.

There are two alternatives open to a party who discovers fraud: (1) he or she may *promptly* act to repudiate the agreement, return any benefits received and seek rescission, *or* (2) the party may continue to perform, thus ratifying the contract, in which case he or she may obtain damages to redress the injury inflicted by the fraud. *Telma v. Gingell,* 157 Md. 411, 413, 146 A. 221 (1929). Ratification *does not* deprive injured parties of all redress for fraud. *Sommers v. Dukes,* 208 Md. 386, 393, 118 A.2d 660 (1955); *Levin v. Hurwitz,* 148 Md. 249, 254, 129 A. 218 (1925). The trial court was therefore in error when it instructed the jury that, if they found appellants had ratified the guaranties, they could not recover damages on their counterclaim.

Ratification and redress may be the only real solution to a party who discovers fraud. In *One Twenty Realty Company v. Baer*, 260 Md. 400, 409, 272 A.2d 377 (1971), quoting Annotation, *Fraud—Waiver by Acts Under Contract*, 13 A.L.R.2d 807, 842–54 (1950), the Court of Appeals recognized that it is often impracticable to stop performance abruptly under certain types of contracts. The Court stated:

> "The great majority of the cases support the rule that where the defrauded party has in part, or at least in substantial part, performed the contract at the time of discovering the fraud, he may go on with performance and also recover or have the appropriate allowance of damages. And the decisions are very strongly to the effect that there is no waiver by the mere going on with the contract if, when the fraud was discovered, a stopping or abandonment of performance was not reasonably practicable, or, to express a similar idea, if the defrauded party was then in a situation from which he was unable to recede without prejudice."

This was certainly the situation in the instant case. Rescission would have been extremely difficult because, at the time the fraud was discovered, in addition to the original limited partners, there were other limited partners involved in the project. These limited partners would have been adversely affected had appellants tried to rescind the loan agreement. Instead, appellants tried to get leases and make the project work. These efforts ended when Fairfax foreclosed. There is no evidence that Ellerin intended to waive his right to damages by remaining silent about the guaranties and attempting to obtain tenants. Ellerin's actions were an election to ratify the contract. The trial court evidently believed that once a party ratified he assented to its terms and it was as if the fraud never occurred. Hence, the instruction that, if the jury found ratification, it was to enter judgment for Fairfax and could not proceed to award damages for the fraud.

■ We remand for a new trial on *all* issues, including the fraud. In light of these erroneous instructions, we must view the verdict as the jury did. The first in a series of questions the jury addressed to the court asks: "If we have answered *NO* on one or more of the first six questions [*i.e.*, a negative finding of fraud] and we cannot unanimously agree on the answer *YES* to one or more of the first six questions, [*i.e.*, a positive finding of fraud] what should we do?" The other questions exhibit confusion about crucial interrogatories in regard to fraud. The jury's questions end with a rather plaintive request for a trial transcript. The confusion, combined with the erroneous instructions, bring the entire verdict into question. We cannot ignore the likelihood, in light of the jury's confusion, and especially its first question to the court, that, had the trial court correctly instructed the jury, there could have been no finding of fraud. Only by a new trial can we be sure that the verdict is completely untainted by the erroneous instructions.

It is unnecessary for us to reach the evidentiary issues raised by appellants because we remand for a new trial. Summary judgment in the Partnership Cases for Fairfax must be vacated because judgment rested on the Guaranty Cases, which are to be retried. We must, however, consider one last matter.

—Appellants' Motion to Strike Portion of
Fairfax's Brief—

■ Appellants filed this motion two days before oral argument. The portion of Fairfax's brief that appellants seek to have us strike urges us to remand for a new trial on *all* the issues if we hold that the trial court erred in its ratification instruction. The gist of appellants' argument is that, because Fairfax prevailed below, in absence of a cross-appeal, it can only urge us to affirm the judgment. We disagree and explain.

While it is true that a cross-appeal must be taken by the party prevailing in the trial court if he wishes to preserve

adverse rulings, *Maryland–National Capital Park and Planning Commission v. Friendship Heights*, 57 Md.App. 69, 79, 468 A.2d 1353 (1984), the jury verdict was a favorable one for Fairfax. As we stated above, the entire verdict was suspect because of the erroneous instructions, and the jury's resulting confusion. It would ill serve the purposes of justice to have the type of tunnel vision appellants advocate. "[A]s to related claims adjudicated in the same action, one cannot 'have his cake and eat it too' by accepting the rewards of those portions of the decree he finds palatable while reserving the right to contest the balance." *Kicherer v. Kicherer*, 285 Md. 114, 117, 400 A.2d 1097 (1979). Appellants want to have their cake and eat it too by asserting that the erroneous ratification instruction tainted the jury's verdict but only a specified part of that verdict. Moreover, striking a portion of Fairfax's brief is of little use to appellants simply because, as an appellate court we independently determine what is just and necessary—we do not rely totally on a party's brief to fashion relief.

JUDGMENTS REVERSED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID ONE–FIFTH BY R. BRUCE ALDERMAN, THREE–FIFTHS BY FAIRFAX SAVINGS ASSOCIATION, AND ONE–FIFTH BY APPELLANTS CHARLES ELLERIN, LOUIS SEIDEL, AND TRI-ESS, INC.