**John E. STEIGERWALD, III and Worldwide Charters, LLC,**

v.

**Allen W. BRADLEY, et al.**

**No. Civ. CCB–99–2883.**

United States District Court, D. Maryland.

March 28, 2001.

Louis B. Price, Francis S. Brocato, Baltimore, MD, for John E. Steigerwald, III and Worldwide Charters, LLC.

Philip J. McNutt, Hughs & Bentzen, PLLC, Washington, DC, for Allen W. Bradley, Bradley Flying Services, Inc. and Gibraltar Aviation Ltd.

Charles S. Hirsch, Robert A. Scott, Ballard, Spahr, Andrews & Ingersoll, Baltimore, MD, for Summit Bank.

## MEMORANDUM

BLAKE, District Judge.

This case arises from a transaction in which plaintiff John E. Steigerwald, III contracted to acquire an aircraft from defendant Allen W. Bradley. The actual purchase involved companies owned or controlled by Mr. Steigerwald and Mr. Bradley and was financed through a loan made by defendant Summit Bank ("Summit"). When certain improvements on the aircraft were not made, Mr. Steigerwald and Worldwide Charters, LLC ("Worldwide") sued Mr. Bradley, Bradley Flying Services, Inc., Gibraltar Aviation, Ltd., and Summit. In response, Summit filed a counterclaim seeking money it alleges the plaintiffs owe under the loan agreements. Currently pending before the court is Summit's motion for summary judgment on the claims asserted by the plaintiffs and on its counterclaim. The motion has been fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the court will grant Summit's motion for summary judgment.[1]

---

1. Also pending is the plaintiffs' Motion for     Discovery Expenses under Fed.R.Civ.P.

## BACKGROUND

Mr. Steigerwald, Mr. Bradley, and the companies they each own or control have bought and sold several airplanes during the past decades. (Mem.Sup.Mot. for Sum.Jud., Ex. 1, Steigerwald Dep. at 34–35; Pl.s' Opp., Ex. 5.) Before detailing the transaction that gave rise to this lawsuit, it is necessary to explain the relationships between the parties. Mr. Steigerwald owns and controls plaintiff Worldwide. In addition, he owns the J.E. Steigerwald Co., Inc. ("Steigerwald Co.") which installs flooring in commercial buildings and marine vessels, (Steigerwald Dep. at 10–11), Paradise Aviation which serves as "a gas station for airplanes," (id. at 25), and a company called South Florida Fighter Jet Association, Inc., (id. at 28, 161–63).[2] Worldwide, Paradise Aviation, and the South Florida Fighter Jet Association each own airplanes. (Id. at 27–28, 161.) Mr. Bradley is an aircraft broker and owns Bradley Flying Services, Inc.; his wife owns Gibraltar Aviation, Ltd.[3] Through those companies, Mr. Bradley buys and sells aircraft. (Pl.s' Opp., Ex. 2, Bradley Dep.; Ex. 1, Steigerwald Dep. at 42–44.) In the course of that business, Mr. Bradley has developed a relationship with Summit in which Summit finances many of the transactions undertaken by his companies.

(Pl.s' Opp., Ex. 5). Mr. Steigerwald and his companies have also financed the purchases and sales of aircraft through Summit. (Steigerwald Dep. at 58, 60–61; Pl.s' Opp., Ex. 3.)

In 1994, Seawolf, another company owned and controlled by Mr. Steigerwald, purchased a Citation One airplane from Mr. Bradley. (Steigerwald Dep. at 57–58.)[4] The purchase was financed by a loan from Summit in the amount of $1.1 million.[5] That loan was approved by Robert Ewing, a loan officer at Summit. (Id.) In 1997, Mr. Steigerwald contacted Mr. Ewing and told him that the Citation was too small for his personal and business needs. (Mem.Sup.Mot. for Sum.Jud., Ex. 2, Ewing Aff. ¶ 6; Steigerwald Dep. at 179–80.) Later that year, Mr. Steigerwald asked Mr. Ewing to "look at a Falcon 20," which is a larger aircraft than the Citation. (Steigerwald Dep. at 62, 179–80.) Mr. Steigerwald wanted to purchase the Falcon and have Summit finance the deal. The Falcon was not owned by any of the Bradley defendants. Without inspecting the Falcon, Mr. Ewing declined to finance the transaction. (Id. at 62–63.) Mr. Ewing states that he did so because "the bank was concerned that Steigerwald would not be able to make the payments without a

---

37(a)(4) against Mr. Bradley, Bradley Flying Services, Inc., and Gibraltar Aviation, Ltd. The Bradley defendants have not filed an opposition. Accordingly, the court will grant the motion and allow the plaintiffs 21 days to provide a list of the expenses they incurred and seek to recover.

2. Mr. Steigerwald's wife owns 25% of Worldwide and may co-own the South Florida Fighter Jet Association, Inc. (Steigerwald Dep. at 28–29.)

3. The court adopts the abbreviation used by Summit in its pleadings and refers to Mr. Bradley, Bradley Flying Services, Inc., and Gibraltar Aviation, Ltd. collectively as the "Bradley defendants."

4. It is unclear whether the Citation One was purchased from Mr. Bradley or Bradley Flying Services, Inc. (See Steigerwald Dep. at 57–59; Compl. ¶ 10.) That distinction is not relevant to the current motion.

5. At that time, Summit was called United Jersey Bank. (Pl.s' Opp. at 3; Steigerwald Dep. at 55.) Mr. Steigerwald states that his purchase of the Citation One came about because Bob Beach, an employee of United Jersey Bank, gave his name to Mr. Bradley, who then contacted him and offered to sell the plane. (Id. at 55–56, 57 A.2d 810.)

constant stream of charter revenue." (Ewing Aff. ¶ 7.) [6] Mr. Steigerwald, however, obtained financing from another source, Green Tree Financial, and purchased the Falcon without Summit. (Steigerwald Dep. at 63–64.)

As a result of his inquiry about purchasing a larger plane, Mr. Ewing subsequently informed Mr. Steigerwald that Mr. Bradley had a suitable airplane for sale. (*Id.* at 64–65.) In early 1998, Mr. Bradley contacted Mr. Steigerwald and told him that he had a Hawker aircraft for sale; Mr. Steigerwald examined the Hawker but declined to purchase it. (*Id.* at 65–67.) He also declined to purchase a second Hawker that Mr. Bradley offered. (*Id.* at 67–70.) Even though he did not purchase the second Hawker, Mr. Steigerwald submitted updated financial information to Summit in the process of examining it. (*Id.* at 68–69.) In that updated information, Mr. Steigerwald did not disclose his purchase of the Falcon. (Counterclaim ¶ 12.) Shortly thereafter, Mr. Bradley presented a third Hawker. Mr. Steigerwald agreed that Worldwide would purchase that Hawker for $1.35 million.

Mr. Steigerwald, Mr. Bradley, and Mr. Ewing then negotiated the terms of the sale and financing. (*Id.* at 73–74.) Under the conditions of their agreement, Worldwide paid Mr. Bradley $25,000 cash and transferred title to the Citation One to Bradley Flying Services and Gibraltar. (Compl.¶ 13.) At that time, Worldwide owed approximately $1,050,000 on the Citation. Summit released that lien and executed a new loan to Worldwide in the amount of $1,351,350. (Mem.Sup.Mot. for Sum.Jud., Ex. 3.) The new loan was secured by guaranties executed by Mr. Steigerwald and the Steigerwald Co. (*Id.*, Ex. 4.) Under its terms, Worldwide was to make monthly payments of approximately $15,000 beginning August 31, 1998 and ending July 31, 2000. At that time, the remaining principal and interest owed, approximately $1.23 million, would be due. (*Id.*, Ex. 3.)

Summit paid the difference between the Citation and Hawker loans (approximately $300,000) to the Bradley defendants. That money was to be used to make certain repairs to the Hawker. Further, Summit required the Bradley defendants to "post an additional $100,000 cash collateral as additional security for the loan to Steigerwald . . . ." (Ewing Aff. ¶ 11; Summit's Reply, Ex. A, Def.s' Sec.Supp. Answers to Interrog. at 3; Pl.s' Opp., Ex. 10.) In August 2000, that money was credited to the amount owed by Worldwide under its loan from Summit. (Pl.s' Opp. at 9; Mem. Sup.Mot. for Sum.Jud., Ex. 8 at 9–10.)

The agreement between the Bradley defendants and Mr. Steigerwald regarding the improvements to be made on the Hawker was not reduced to a formal contract. (Steigerwald Dep. at 75–76; Pl.s' Opp. at 7, Ex. 7.) The parties agree that, with the repairs allegedly promised by the Bradley defendants, the Hawker would have been worth at least $1.35 million. (Summit's Reply at 6–7; Steigerwald Dep. at 103–05.) Without them, however, the aircraft could not be used in charter service and, therefore, had a much lower value. Mr. Steigerwald never inspected or asked Summit to inspect the Hawker before agreeing to purchase it. (Mem.Sup. Mot. for Sum.Jud. at 6; Steigerwald Dep. at 48–49.) Prior to executing the loan, however, Summit undertook an appraisal of the Hawker on its own accord. (Ewing Aff. ¶ 12.) The aircraft evaluation sheet prepared by Mr. Ewing noted the im-

6. Some time earlier in 1997, Summit declined to finance another transaction proposed by Mr. Steigerwald in which he attempted to purchase an aircraft from an owner other than the Bradley defendants. (Steigerwald Dep. at 62).

provements to be made to the airplane, the fact that "Book prices are below current asking prices as per Amstat," and that "Al [Bradley] wants [$]300,000." (Pl.s' Opp., Ex. 8 at SB0240.) Mr. Ewing also noted that "[a] conservative value for the aircraft at 90% of retail would be $1,200,000[ ], but with only three aircraft on the market and none in as good a condition I believe that this aircraft warrant[s] a finance value of $1,350,000." (Id., Ex. 3 at SB0023.) Accordingly, Summit set a loan value on the Hawker of approximately $1.34 million. (Pl.s' Opp., Ex. 3, 8.)

The Bradley defendants were to deliver the Hawker to Worldwide in the fall or winter of 1998 after completing the specified repairs. (Compl. ¶ 16; Pl.'s Opp., Ex. 7.) Neither the repairs nor the delivery was ever made. In July 1999, Worldwide took possession of the unimproved Hawker. (Id. ¶ 22.) Because the repairs had not been made, Worldwide notified the Bradley defendants that it would not accept the aircraft and would act as an "aggrieved buyer of rejected goods." (Id. ¶ 24–26.) It also stopped making payments on the loan from Summit. (Ewing Aff. ¶ 14.) Summit sent letters to Mr. Steigerwald demanding payment and informing him that the loan was in default. (Id.) In January 2000, Worldwide sold the Hawker to Kevin McCluskey for $1.15 million. (Steigerwald Dep. at 146–48.) Of that price, $1,060,140.16 was credited to Worldwide's loan from Summit. (Pl.s' Opp., Ex. 15; Mem.Sup.Mot. for Sum.Jud., Ex. 8.)

Mr. Steigerwald and Worldwide filed this lawsuit on September 22, 1999. In their complaint, they state claims against the Bradley defendants for fraud, rescission, breach of contract, breach of express and implied warranty, and fraudulent conveyance. (Compl.¶¶ 56–93.) In addition, they assert seven claims against Summit Bank. In those Counts, they allege negli-

gent and intentional misrepresentation (id. ¶¶ 94–110), constructive fraud (id. ¶¶ 111–14), negligence (id. ¶¶ 115–24), liability for the Bradley defendants' fraud (id. ¶¶ 125–30), and two claims for rescission of the loan agreement. The plaintiffs seek $4,000,000 in compensatory and $6,000,000 in punitive damages, restitution of the sales price paid, and garnishment of the Bradley defendants' property.

The defendants each filed answers. In addition, the Bradley defendants filed a third party complaint against Marvel Air, Inc., alleging that Marvel Air failed to repair the Hawker. Marvel Air has not responded to the complaint. Also, Summit stated a counterclaim against Worldwide, Mr. Steigerwald, and the Steigerwald Co. In the counterclaim, Summit states claims for breach of contract against all three counter-defendants on the grounds that Mr. Steigerwald and the Steigerwald Co. guaranteed the promissory note executed by Worldwide in favor of Summit. (Counterclaim ¶¶ 23–36.) Summit also states claims for fraud and negligent misrepresentation against Worldwide and Mr. Steigerwald for the alleged failure to disclose the purchase and financing of the Falcon 10 in 1998. (Id. ¶¶ 37–52.) Summit seeks either replevin of the Hawker from Worldwide or $1,334,093.81 plus pre- and post-judgment interest. Effectively, therefore, Summit seeks a dismissal of the claims against it and a declaration that the plaintiffs owe it $1,334,093.81 plus interest.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

[Summary judgment] shall be rendered forthwith if the *** pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, *** show that there is no genuine issue as to any material fact *** and that the mov-

ing party is entitled to a judgment as a *** matter of law.

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In making this determination, the evidence of the party opposing summary judgment is to be believed and all justifiable inferences drawn in her favor. *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir.1997) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party may not rest upon mere allegations or denials in her pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat a defendant's summary judgment motion. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

■ In its motion, Summit requests summary judgment both on the claims made against it by the plaintiffs and on its counterclaim against Worldwide, Mr. Steigerwald, and the Steigerwald Co. The

plaintiffs argue that issues of material fact require the court to deny both aspects of the motion.[7] Those arguments are analyzed in the sections that follow.

## I. The Plaintiffs' Claims Against Summit

The plaintiffs' first four claims against Summit are premised on alleged misrepresentations about the Bradley defendants and the bank's failure to disclose the value and purchase price of the Hawker. First, Mr. Steigerwald alleges that Mr. Ewing told him that Mr. Bradley "was one of the bank's biggest and best customers." (Steigerwald Dep. at 118.) Further, he states that Mr. Bradley told him, "[I am] a big-time customer of the bank, I did $52 million last year, I have them in my hip pocket, they'll do what I ask them to do." (*Id.* at 73–74.) Mr. Steigerwald alleges that he relied on those statements in deciding to purchase the aircraft from the Bradley defendants. Further, he claims that the statements misrepresent Mr. Bradley's financial status and reliability. Indeed, the Bradley defendants appear to be suffering severe financial difficulty. (Pl.s' Opp., Ex. 2; Compl. ¶ 28.)

The plaintiffs also argue that Summit had a duty to disclose to Mr. Steigerwald its appraisal of the Hawker and the nature of its relationship with the Bradley defen-

---

7. The plaintiffs also argue that the court should defer ruling on the motion for summary judgment until discovery is completed. (Pl.s' Opp. at 2 n. 1.) They do not, however, attach an affidavit specifying the discovery that they require to oppose adequately the motion. ·See Fed.R.Civ.P. 56(f); *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 961 (4th Cir.1996) ("[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.") (citations and internal punctuation omitted).

Rather, they state in their opposition that they have not yet deposed Mr. Ewing. The plaintiffs do not provide any reason for their failure to do so, and Summit states that they have made Mr. Ewing available. Further, the plaintiffs have had difficulty obtaining discovery from the Bradley defendants. They have not made a specific showing, however, that either Mr. Ewing's deposition or the discovery sought from the Bradley defendants would enhance their opposition to this motion. The court cannot conclude, therefore, that it should defer ruling on the motion for summary judgment.

dants. The Bradley defendants originally purchased the Hawker for $870,000; they then sold it to Worldwide for $1.35 million with the understanding that certain repairs would be completed. Although Mr. Steigerwald did not undertake an appraisal of the Hawker, Summit did so prior to executing the loan; as noted above, Summit set a loan value on the Hawker of approximately $1.34 million. (Pl.s' Opp., Ex. 3, 8.) The plaintiffs contend that Summit defrauded them by not informing Mr. Steigerwald about the purchase price and appraisal and by failing to tell them that the Hawker could not be improved sufficiently to warrant a resale price of $1.35 million.

■ Finally, the plaintiffs allege that Summit and the Bradley defendants acted as partners, or that the Bradley defendants were agents of the bank. They claim that Summit was required to disclose the nature of that relationship. Further, the plaintiffs argue that Summit is liable for the Bradley defendants' actions. These claims are analyzed below.[8]

### Summit's Duty: Negligent Misrepresentation, Constructive Fraud, Negligence

■ To state a cause of action for negligent misrepresentation, negligence, or constructive fraud, the plaintiffs must show that Summit owed them a duty.[9] *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992). *See also DeLeon Enterprises, Inc. v. Zaino*, 92 Md. App. 399, 608 A.2d 828, 837 (1992) (explaining the elements of negligent misrepresentation) (citing *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534, 539 (1982)); *Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039, 1059 (1999) (stating the

8. The plaintiffs also have stated two claims for rescission. They argue that rescission of the loan agreements is proper because there was a mutual mistake between the parties and because the Bradley defendants' failure to perform has rendered the agreements commercially impracticable. (Compl.¶¶ 131–139.) In response, Summit contends that the plaintiffs did not act promptly upon learning of the Bradley defendants' breach and that they have not tendered all consideration. (Mem.Sup.Mot. for Sum.Jud. at 22–23.) The plaintiffs have not responded to these arguments, and the court agrees that rescission is not available to them. In their complaint, the plaintiffs state that the improvements should have been finished within three weeks after the sale of the Hawker. (Compl.¶ 16.) Nevertheless, Mr. Steigerwald waited more than a year before taking action. Then, rather than treating the contract as rescinded and leaving the Hawker with the Bradley defendants, Mr. Steigerwald took possession of the plane, as he was entitled to under the contract. He resold it and applied the money toward the loan from Summit. The court concludes, therefore, that Mr. Steigerwald neither acted promptly, nor treated the contract or loan agreements as rescinded. Rescission, therefore, is unavailable to him. *See Ellerin v. Fairfax Savings Association*, 78 Md.App. 92,

552 A.2d 918, 927 (1989) ("If a party acts in a way which recognizes the subsisting validity of the contract or indicates that he or she still feels bound under it, he or she will be held to have waived the right to rescind."); *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867, 894 (1984); *Lazorcak v. Feuerstein*, 273 Md. 69, 327 A.2d 477, 481 (1974).

9. The plaintiffs' constructive fraud claim asserts a violation of Summit's "confidential and fiduciary relationship" and the failure to "exercise such utmost good faith and fair dealing." (Compl.¶¶ 113–14.) The court interprets this count as a claim for breach of fiduciary duty, not a claim for breach of an implied covenant of good faith and fair dealing. Maryland courts have been reluctant to recognize separate claims for breach of the covenant of good faith and fair dealing. *See, e.g., Adams v. Coates*, 331 Md. 1, 626 A.2d 36, 41 (1993). Even if such a claim were viable in this case, however, the plaintiffs could not succeed on it. *See Parker*, 604 A.2d at 530–31 (explaining that the duty of good faith and fair dealing "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."); *Edell & Associates, P.C. v. Law Offices of Peter Angelos*, 106 F.Supp.2d 790, 796–97 (D.Md.2000).

elements of a claim for fraudulent concealment). Further, "[i]t is pellucid that, in Maryland, the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor, and is not fiduciary in nature." *Yousef v. Trustbank Savings, F.S.B.*, 81 Md.App. 527, 568 A.2d 1134, 1138 (1990) (citations omitted). Nonetheless, the plaintiffs contend that Summit owed them a duty.

Maryland courts have recognized that "special circumstances" may exist which are "sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship...." *Parker*, 604 A.2d at 532. In *Parker*, the court accepted the reasoning of a Washington state court which had found that special circumstances might exist when the bank

> (1) took on any extra services on behalf of [the borrowers] other than furnishing the money for construction of a home; (2) received any greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control over the construction; or (4) was asked by [the borrowers] if there were any lien actions pending.

*Id.* at 533 (quoting *Tokarz v. Frontier Federal Savings and Loan Ass'n*, 33 Wash.App. 456, 656 P.2d 1089, 1094 (1982)). There is no contention that the third or fourth criteria are applicable in this case. Rather, the plaintiffs allege that special circumstances are present because Summit made the initial contact between Mr. Steigerwald and Mr. Bradley, appraised the Hawker, and retained $100,000 of the loan as collateral.

"Courts have been exceedingly reluctant to find special circumstances," *id.* at 532, and the court finds the plaintiffs' contentions insufficient in this case. By introducing two preexisting customers, one who had an airplane to sell, and one who desired such a plane, Mr. Ewing did not engage in such "truly extra, out of the ordinary services" on behalf of the plaintiffs as to warrant a finding of special circumstances. *Id.* at 534. The bank's internal evaluation of the loan for its own purposes also was not out of the ordinary. *Id.* at 533. Nor have the retention of the $100,000 collateral, which eventually was credited toward loan repayment, (Mem. Sup.Mot. for Sum.Jud., Ex. 8 at 9–10), or the 40% equity kicker, which was not applicable to the sale of the Hawker (Summit's Reply, Ex. B, Ewing Aff. ¶ 8), been shown to constitute an economic benefit greater than that to be expected from a normal mortgage. *See Parker*, 604 A.2d at 533.

Finally, the court notes the court's language in *Parker*:

> If the Parkers' situation were clearly analogous to that of the borrowers in *Yousef*—that is, if the Parkers were business people with more experience dealing with banks and if they were relying on a contractual provision designed for the exclusive benefit of the lender as the sole source of the affirmative duty they allege—then we would, without further elaboration, affirm the circuit court's order to dismiss [for lack of a duty owed by the bank].

*Id.* at 532. Like the plaintiffs in *Yousef*, Mr. Steigerwald is an accomplished businessman who has significant experience with banks and contracts. (Steigerwald Dep. at 13–17; Pl.s' Opp., Ex. 3.) When Summit refused to finance the Falcon, he obtained financing elsewhere. Further, he declined to purchase the first Hawker offered by Bradley after the bank put them in contact. There is, therefore, little reason to think that a "special relationship" with Summit controlled his decision to purchase the aircraft from the Bradley defendants.

■■■ The plaintiffs also argue that Summit had a duty to disclose "based on partial disclosures" and its "superior knowledge." (Pls.' Opp. at 16, 20.) First, they contend that, by stating that Mr. Bradley was one of its "biggest and best customers," Summit obligated itself to disclose information about the purchase of the Hawker and its relationship with the Bradley defendants. The plaintiffs have not shown, however, that they asked Summit about the Bradley defendants or that the bank undertook to advise them; indeed, they had purchased the Citation from Gibraltar several years before. *Cf. Central States Stamping Co. v. Terminal Equipment Co., Inc.,* 727 F.2d 1405, 1408–09 (6th Cir.1983) ("[O]nce Martin undertook to advise Scheer with respect to Terminal's financial condition he had a duty to disclose information in his possession which would reasonably be considered material to the decision he knew Scheer was ... making."). Mr. Ewing's statement, by itself, is not of the kind sufficient to impose a duty of disclosure. The plaintiffs also contend that a duty arose because Summit had knowledge of the Bradley defendants' financial situation as well as the purchase price and true value of the Hawker. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, National Association,* 731 F.2d 112, 123 (2d Cir.1983). There is no indication, however, that financial information about the Bradley defendants was not available to the plaintiffs. Moreover, the Bradley defendants' allegedly-poor financial situation would not necessarily lead to a conclusion that repairs would not be made as promised because money for those repairs was included in the amount of the loan. Further, in cases involving superior knowledge and partial disclosure "a disclosure duty ripens only when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact." *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2nd Cir.1995). The plaintiffs have not made such a showing.[10]

Thus, the plaintiffs have not shown that Summit owed it a duty to disclose information about the Bradley defendants. Accordingly, summary judgment will be granted on their negligent misrepresentation, negligence, and constructive fraud claims.

*Reliance: Intentional and Negligent Misrepresentation*

■■■■ To state claims for intentional and negligent misrepresentation, the plaintiffs must show that they justifiably relied on a false statement. *See DeLeon Enterprises,* 608 A.2d at 837 (explaining the elements of negligent and intentional misrepresentation). These claims are premised on Mr. Ewing's statement that Mr. Bradley was one of the bank's "biggest and best customers." The plaintiffs allege that "[e]ssentially, Bradley defrauded Steigerwald.... Bradley is not the man of substance which Summit represented him to be." (Pls.' Opp. at 12.) The claims cannot be based on Summit's appraisal of the Hawker, relationship with Mr. Bradley, or the loan arrangement because Mr. Steigerwald did not have knowledge of those facts and, therefore, could not have relied on them.

---

10. Finally, the plaintiffs argue that Summit owed them a duty based on a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691. That statute, however, is designed to prevent discrimination in lending and is inapplicable to the current suit. *Id.* Further, the plaintiffs are not entitled to relief under the Act because they are not members of a protected class. *First Fidelity Bank, N.A., New Jersey v. Best Petroleum, Inc.,* 757 F.Supp. 293, 296 (S.D.N.Y.1991) ("The cases have held that a party must be a member of a protected class in order to assert a claim under the ECOA.")

■ First, Summit contends that the plaintiffs have not proved that the statement was, in fact, false. While there is evidence that the Bradley defendants were suffering financial difficulty, (Pl.s' Opp., Ex. 2; Compl. ¶ 28), there has been no allegation that these difficulties affected their commitments to Summit. Further, Summit's loan documents show that the bank has a longstanding relationship with Mr. Bradley. (Steigerwald Dep. at 131; Pl.s' Opp., Ex. 5.) Thus, the plaintiffs have not proven that Mr. Ewing's statement was false. Further, they have not shown that it was the sort of statement on which they could have justifiably relied. To serve as the basis for a claim of intentional misrepresentation, a statement must not be an opinion, estimate, or mere "puffing," but must be a misrepresentation of material fact. *See Parker,* 604 A.2d at 528; *Miller v. Premier Corp.,* 608 F.2d 973, 981 (4th Cir.1979) ("an unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud"); *Polson v. Martin,* 228 Md. 343, 180 A.2d 295, 296–97 (1962). As an experienced businessman, Mr. Steigerwald should not have accepted Mr. Ewing's statement as more than an opinion about Mr. Bradley. It is not a material misrepresentation and, therefore, cannot serve as the basis for a misrepresentation claim.

*Agency*

■ Finally, the plaintiffs assert that the Bradley defendants are Summit's agents and that, therefore, Summit is responsible for their misconduct. (Compl.¶¶ 125–30.) The plaintiffs have the burden to prove "the existence of the principal-agent relationship, including its nature and its extent ... [and] to produce legally sufficient evidence of a principal-agent relationship." *Green,* 735 A.2d at 1048 (citing *Hofherr v. Dart Industries, Inc.,* 853 F.2d 259, 262 (4th Cir.1988)). In examining that proof, the court will look to

three important characteristics: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Id.*

The plaintiffs have produced no evidence that the Bradley defendants had the right to act for Summit, that they had a duty to act for Summit's benefit, or that they were controlled by Summit. Indeed, the final negotiations regarding the finance agreements took place with Mr. Ewing. (Steigerwald Dep. at 74.) Further, there is no indication that Mr. Bradley could bind Summit to a loan agreement or that Summit could require Bradley to sell an airplane.

■ The plaintiffs do not argue this point in their opposition. Rather, they contend that Summit and the Bradley defendants acted as partners. As support for this argument, the plaintiffs allege that Summit and the Bradley defendants shared the profits from the Hawker sale. They contend that Summit received 40 percent of the net profit when the aircraft was sold and retained $100,000 of the loan it gave to Worldwide. In response, Summit argues that they 40% profit sharing is part of a floor plan financing agreement between itself and Gibraltar. The bank charges Gibraltar a lower interest rate and accepts the 40% payment as an "equity kicker" in place of the market rate. (Summit's Reply at 14–15.) The arrangement is not implicated in this case because the Hawker was sold by Bradley Flying Services, not Gibraltar, and the bank did not retain 40% of the profits from the sale. (Summit's Reply, Ex. B, Ewing Aff. ¶ 8.) Further, the bank states that the $100,000 was simply a form of additional security. (Mem.Sup.Mot. for Sum.Jud., Ex. 2, Ewing Aff. ¶ 11.) The plaintiffs also argue that, based on the original purchase price of the

Hawker, roughly $870,000, the bank lent Worldwide much more than the aircraft was worth. All sides agree, however, that if the repairs had been made in accordance with Mr. Steigerwald's request, the Hawker would have been worth at least the $1.35 million sale price.

The court cannot conclude that the plaintiffs have met their burden to show that Summit and the Bradley defendants were partners. They have produced no formal evidence of a partnership and have not shown that the 40% "equity kicker" was implicated in the sale of the Hawker or that the $100,000 collateral differed from Summit's usual financing arrangements. *See Cohen v. Orlove,* 190 Md. 237, 57 A.2d 810, 812 (1948). Thus, the plaintiffs have failed to show that the Bradley defendants were either Summit's agents or partners. Accordingly, the court will grant summary judgment in favor of Summit on this count.

## II. Summit's Counterclaim

In its counterclaim, Summit states counts for breach of contract against Mr. Steigerwald, Worldwide, and the Steigerwald Co., as well as claims for fraud and negligent misrepresentation against Mr. Steigerwald and Worldwide. (Counterclaim ¶¶ 37–52.) It seeks a judgment in the amount of $1,334,093.81 plus costs and interest.[11] The plaintiffs do not address any portion of their opposition specifically to the counterclaim.

The three claims for breach of contract arise because Worldwide borrowed the money from Summit, and Mr. Steigerwald and the Steigerwald Co. guaranteed the loan. Aside from the arguments raised in opposition to the motion for summary judgment on their complaint, the plaintiffs do not present any defense to the breach of contract claims. For the reasons explained above, the court does not find those arguments persuasive. Accordingly, it concludes that the counter-defendants are in default on the loan agreement from Summit. The court, therefore, will grant summary judgment in favor of Summit on those counts. It is not necessary to reach Summit's claims for fraud and negligent misrepresentation because the same relief is requested.

The court does find, however, that there is some uncertainty about the amount owed by Mr. Steigerwald and his companies. The original loan was for approximately $1.35 million, and Worldwide made monthly payments beginning in August 1998 for almost a year. (Ewing Aff. ¶ 14; Mem.Sup.Mot. for Sum.Jud., Ex. 8.) Also, Worldwide may have been charged interest on the $100,000 that Summit retained until that sum was credited to Worldwide's loan in August 2000. (Pls.' Opp. at 9.) Further, money earned by Worldwide from its sale of the Hawker, $1,060,140.16, was credited to Worldwide's loan from Summit. (Pls.' Opp., Ex. 15; Mem.Sup. Mot. for Sum.Jud., Ex. 8.) Finally, in his initial affidavit, Mr. Ewing stated that "[a]s of August 1, 2000, Steigerwald owes a total of $228,882.96 under the Note." (Mem.Sup.Mot. for Sum.Jud. at 27–28; *Id.,* Ex. 2, Ewing Aff. ¶ 20.) It seems unlikely, therefore, that Summit is owed the $1,334,093.81 they seek, but neither side has provided adequate information for the court to determine the actual amount owed. Accordingly, the court will grant summary judgment in favor of Summit as to Mr. Steigerwald's liability on its counterclaim and accept additional pleadings as

---

11. Summit also states a claim for replevin of the Hawker. The plaintiffs, however, have already sold the plane and credited the sale price to the loan. The court does not reach this claim because it concludes that Summit is entitled to the money still owed under the loan agreement.

to the amount owed by Mr. Steigerwald and his companies.

A separate Order follows.